OPINION
Defendant-appellant Bradley W. Tapp appeals the June 13, 2001 Judgment Entry of the Delaware County Court of Common Pleas which denied his petition for post-conviction relief. Plaintiff-appellee is the State of Ohio.
STATEMENT OF THE CASE AND FACTS
On September 4, 1999, appellant attended a wedding reception with his girlfriend. The two quarreled and appellant left the reception, intoxicated and extremely upset. His girlfriend would not give him the keys to his car, so he walked down the street. For reasons known only to appellant, he decided to punch a mailbox, and then a second mailbox as he walked. After he punched the second mailbox, Michael Westfall yelled at him to stop.
Michael Westfall, the owner of the second mailbox, approached appellant for an explanation. At first, appellant kept going, but then turned and punched Mr. Westfall. Mr. Westfall immediately fell to the ground, where appellant began kicking him. Mr. Westfall called out to a neighbor, Brooke Ramsey, who ran to his aid. Unfortunately, appellant also punched, and apparently knocked out Mr. Ramsey. As Mr. Ramsey fell, his head hit a parked car which caused further injury. Appellant left the two men on the ground, bleeding and unconscious.
Neighbors called for ambulances and both men were taken to St. Ann's Hospital for treatment of their injuries. Appellant walked home, but was unable to get into his apartment because he did not have his keys. He then walked to a local bar where he was arrested for the attack.
On October 22, 1999, the Delaware County Grand Jury indicted appellant with two counts of felonious assault in violation of R.C. 2903.11, and two counts of aggravated assault in violation of R.C. 2903.12. On February 14, 2000, appellant plead guilty to two counts of felonious assault. The two counts of aggravated assault were dismissed.
The trial court conducted a sentencing hearing on March 29, 2000, at which time, Mr. Ramsey and Mr. Westfall made statements to the trial court. Mr. Ramsey stated he could not express what he felt about appellant. He could not understand how appellant could beat him up, and leave him bleeding, unconscious, "face down in a pool of blood."[1]
Mr. Ramsey testified appellant caused him a fractured skull, head contusions, and other bodily injuries. He explained to the court he remained physically and emotionally scared from the event, still experiencing dizzy spells and continuing treatment with a neurologist. Mr. Ramsey asked the trial court to "prosecu[te] * * * [appellant's] criminal acts to the fullest extent."[2]
Mr. Westfall also gave a statement to the court before sentencing. He blamed appellant for the scar on his chest (from the chest tube required to treat his injuries) and a scar on his shoulder from the rotator cuff surgery:
 The one that stands out in my mind is the bruise on my rib cage, that exactly fits the size of the man's foot. [Appellant's] foot. He wasn't satisfied with knocking both Brooke and I unconscious to the ground, you commenced kicking and stomping. He was in that mode, kicking and stomping me when Brooke intervened.
 Two counts of felonious assault, each count carrying a term of a minimum two years, maximum eight years, * * * I don't want the maximum, I understand that Ohio law says that's automatically appealable. I think 15 years will work just fine. I appreciate the court's indulgence and the opportunity to speak, you Honor.
Appellant's trial counsel, Samuel Shamansky, made a closing argument at the sentencing. Mr. Shamansky pointed out appellant plead guilty to accept responsibility and to relieve the victims of the burden of a trial. He related appellant was instantly remorseful and had offered to settle the civil case with the victims. He acknowledged appellant precipitated the acts, but noted appellant promised to continue treatment for alcoholism. Mr. Shamansky also pointed out the overwhelming support offered by appellant's co-workers, friends and family.
Appellant also testified at the hearing. He apologized to the Ramsey and Westfall families, and acknowledged responsibility for the incident. Appellant explained the alcohol was the cause of his irrational behavior. Appellant told the court Mr. Westfall pursued him down to the end of the road, apparently causing him to attack Mr. Westfall, but Appellant took responsibility for the incident.
The trial court also considered Michael Westfall's victim impact statement. Mr. Westfall stated he suffered three broken ribs resulting in a collapsed lung; a broken and dislocated right ankle; a torn rotator cuff on his right shoulder in addition to abrasions and lacerations to his head and body. Mr. Westfall stated he remained in the hospital for five days immediately following the incident, and was required to undergo an operation on December 2, 1999, to repair the damage to his rotator cuff.
In his victim impact statement, Mr. Ramsey stated he suffered numerous injuries as a result of appellant's attack. Mr. Ramsey suffered cracked ribs, numerous bruises and contusions, and a fractured skull. Due to these injuries, Mr. Ramsey spent four days in the hospital, including three days in intensive care. Neither Mr. Westfall's nor Mr. Ramsey's victim impact statement contained copies of medical records.
The trial court also reviewed the presentence investigation report prepared by the State Parol/Probation Department. The report noted Mr. Ramsey and Mr. Westfall were admitted to St. Ann's Hospital. Mr. Westfall suffered from broken ribs, a collapsed lung, and a broken ankle, while Mr. Ramsey was admitted to intensive care with a head injury and possible broken nose.
Appellant was also interviewed for the pre-sentence investigation report wherein appellant stated:
 "I drank to much, I was in a bad state of mind. I punched a mailbox with my hand, then another. I was pursued by one man who called for another man. I was grabbed, I panicked and way over-reacted, using my fists and feet to get them away from me. I left and then called the police."[3]
Appellant admitted he struck Mr. Westfall's mailbox. However, appellant maintained Mr. Westfall pursued him, walking out into the street toward him, ultimately meeting appellant in the center of the road. Appellant stated Mr. Westfall was a "big guy" and was "yelling at him."[4]
Appellant then stated Mr. Westfall grabbed him, and kneed him in the thigh. At the same time, Mr. Westfall called out for someone named Brooke. Appellant maintained he was now in fear he would have to fight two men. Appellant stated he pushed Mr. Westfall away, so he could continue walking. When he saw Mr. Ramsey come out, appellant admits he went "nutty,"[5] his "adrenaline was up and both victims went down."[6]
Appellant stated he would not have reacted that way if he had not been drunk, saying he admitted he "screwed up massively."[7]
The trial court also reviewed appellant's sentencing memorandum, filed with the court on March 22, 2000. In this memorandum, Mr. Shamansky, maintained a period of community control was warranted, but incarceration was unnecessary. Mr. Shamansky argued the incident was alcohol-related, aberrant behavior, and pointed out appellant had undergone counseling for alcohol abuse and regularly attended AA meetings since that time. The memorandum repeatedly sought to show appellant acknowledging the severity of his actions, and his willingness to accept some punishment.
The memorandum also attempted to display appellant as a successful and talented businessman, upon whom a number of family, friends and co-workers relied. In support of the memorandum, Mr. Shamansky attached ten letters of support from co-workers, business associates, friends, a co-AA member and a therapist. Jeffrey Miller, an alcohol and drug counselor who had treated appellant, opined appellant was dependent on alcohol, but had used this horrible incident as a catalyst for positive life changes. Larry Dannemiller, a member of AA, also wrote a letter of support, noting he had met appellant at an AA meeting after the incident and had been in consistent contact with appellant since that time.
Appellant also attached numerous letters from business acquaintances; co-workers; friends; and family. These letters opined the incident in question was completely out of character for appellant and noted appellant's remorse over his action. The letters portrayed appellant as a leader whose work as President of Tropical Nut and Fruit, Inc. provided the drive necessary to make the company grow and succeed.
After reviewing the testimony of the witnesses at the sentencing hearing, the presentence investigation, the victim impact statements, and the sentencing memorandum, the trial court sentenced appellant to seven years on each count, and ordered the terms run consecutively. The trial court stated:
 * * * I have labored long and hard over considering this case and final disposition. I can't help to observe that but for immediate, competent medical attention, that at least in one case, we would be here on a homicide proceeding. This case is very different than the felony cases, the felonious assault cases or the aggravated assault cases that I normally see, wherein individuals chose to consume alcohol, which is perfectly all right, it's legal, it's taxed, and get into the bar fights. The usual thing is someone hits someone else over the head with a pool que or some other form of antisocial behavior.
 This case is very very different. This case involves two utterly innocent human beings, totally innocent.
 Another aspect of this, of course, is the medical bills in this case, they are like what I normally see in personal injuries cases, an automobile runs into another automobile, and that person ends up in the hospital, treated by an orthopod or neurological surgeon, whatever, those bills are somewhat substantial. I think that it's commendable of you that you have at least made an offer to attempt to satisfy the medical bills incurred to date.
 * * * In my opinion the recidivism and seriousness factors favoring the imposition of stated prison terms, outweigh the recidivism and seriousness factors favoring the imposition of community control sanctions for the following reasons: first of all, the injuries to one of the victims, Michael M. Westfall were worsened because of his age, no reflection Mr. Westfall, you are not twenty-one. Mr. Westfall being fifty-nine years of age at the time of the crime charged in count one of the indictment.
 Secondly, both of the victims, Mr. Westfall and Mr. Ramsey, suffered serious physical harm, sustaining numerous injuries, and both of the victims required immediate hospitalization. Mr. Ramsey, the victim in count two of the indictment, having spent three days in intensive care.
 Third, both of the victims, Mr. Westfall and Mr. Ramsey, sustained serious economic harm, in view of their hospitalizations.
 Fourth, both of the victims sustained serious psychological harm, evidenced by their statements, in their respective victim impact statements.[8]
On March 30, 2000, appellant, through his attorney, filed a motion to reconsider the sentence. On April 7, 2000, the trial court conducted a hearing on the motion for reconsideration. Mr. Shamansky made no statement, however, appellant did make a statement. He wanted to make sure the court understood he really wanted to leave. He highlighted he did stop beating and kicking the victims, (apparently, opposed to being pulled away from the victims by a third party). He asked the court for help.
Appellant also presented the oral statement of Mack Horsefall, a business man from Calvary, Alberta, Canada. Mr. Horsefall met and hired appellant when appellant was eighteen years old. Over the course of the next twenty years, Mr. Horsefall considered himself appellant's mentor. Mr. Horsefall told the court appellant was an exceptional businessman, one of the best he had. He knew appellant had made a great mistake and that appellant was full of remorse and self-disgust. However, Mr. Horsefall also explained appellant had the ability and talent to do good for the community. With such talents, it seemed a waste for all involved to place him in prison for such a long time.
After considering the new testimony and the written memorandum, the trial court came to the conclusion the sentence should stand. In particular, the trial court was concerned with the vicious nature of the attack, the serious physical, economic and the psychological harm to "absolutely innocent human beings."[9] In an April 10, 2000, Judgment Entry, the trial court denied appellant's motion for reconsideration and for resentencing.
Appellant appealed that decision to this Court maintaining consecutive sentences were unsupported by the record and the trial court had abused its discretion in imposing a disproportionately harsh sentence. In a December 13, 2000 Opinion, this Court affirmed the decision of the trial court.
On December 1, 2000, appellant filed his motion for post-conviction relief. The motion sought relief to withdraw the plea of guilty or in the alternative to vacate or set aside the sentence due to ineffective assistance of counsel at both the trial preparation and sentencing phases.
The trial court conducted an evidentiary hearing on May 21, 2001. At that time, the Honorable Henry E. Shaw, Jr., the judge who had accepted appellant's plea and sentenced appellant, had recused himself. The Honorable Richard M. Markus was assigned to hear appellant's petition for post-conviction relief.
Appellant's motion presented three claims for relief. First, appellant alleged his trial counsel was ineffective at the plea stage. Appellant maintained Mr. Shamansky never informed him of possible defenses and never fully prepared for the trial of the case. In his second claim for relief, appellant maintained he was denied effective assistance of counsel during the sentencing phase. Appellant argued his trial counsel failed to present mitigation evidence to show appellant had to defend himself from Mr. Westfall. Appellant claimed Mr. Westfall was also intoxicated on the night in question and was an aggressor who had "stalked" him and caused Appellant to turn and attack in self-defense. Appellant also argued Mr. Shamansky never presented two witnesses who were available to testify they had seen a large bruise on appellant's upper thigh, which appellant claims was a result of Mr. Westfall kneeing him.
Appellant also maintained his trial counsel never informed the court Mr. Ramsey's most serious injury, his head injury, was not the result of a landed punch, rather Mr. Ramsey was injured when he lost his balance (after appellant struck him) and fell into a parked vehicle.
Appellant also took issue with the true medical condition of the victims. Appellant maintains his trial counsel did nothing at the sentencing to dispel the trial court's mistaken belief the case was "almost a homicide" due to the severity of the injuries of Mr. Ramsey. Appellant argued the medical records proved Mr. Ramsey, upon admission to the hospital, was "awake, alert, and oriented."[10] Additionally, his trial counsel had the responsibility to present the medical records from St. Ann's Hospital unequivocally proving Mr. Ramsey did not sustain a skull fracture as stated in his victim impact statement, or in his statement to the court at sentencing.
As for Mr. Westfall, appellant claimed medical records conclusively demonstrated he sustained neither a collapsed lung nor an ankle fracture. Due to his trial counsel's failure to present evidence of both victims' exaggerations and fabrications, appellant maintains he was denied effective assistance of counsel during a critical stage of the proceedings.
In his third claim for relief, appellant maintained his plea of guilty was involuntary and coerced. This claim is not at issue in this appeal.
In his affidavit, also attached to the petition for post-conviction relief, appellant stated his trial counsel was unprepared for trial. Appellant claims his trial counsel had not interviewed all of the witnesses to the incident, and had failed to issue subpoenas two days before trial. Appellant also claims his trial counsel never discussed the defenses available for the charges against him, including self-defense.
Attached to the petition for post-conviction relief were appellant's exhibits N, O, and P. Exhibit N is the first page of a three page History and Physical of Mr. Ramsey, taken at St. Ann's hospital on the night of the incident. The document indicates Mr. Ramsey was awake, alert, and oriented during the physical. The report also noted Mr. Ramsey had bilateral raccoon eyes consistent with frontal bone or basilar skull fracture injuries. Pages two and three of this document were not attached to the petition.
Appellant's exhibit O appears to be the results of a CT-brain scan of Mr. Ramsey dated September 4, 1999:
 The document indicates the skull window images do not show any evidence of fracture . . . a very small left frontal subdural hygroma could also be present. No evidence of acute subdural or subarachnoid hemorrhage. Borderline prominent ventricles. No evidence of skull fracture.
As part of the same exhibit, appellant attaches what appears to be another x-ray report for Mr. Ramsey. This report is dated September 5, 1999, and purports to be impressions of views of the cervical spine and facial bones. This document states:
 * * * one wonders whether there is a fracture involving the tip of the nasal bone. Nasal bone films should be obtained to evaluate this. There is no evidence of any fracture elsewhere in the face.
Also part of exhibit O is another of Mr. Ramsey's x-ray reports, a CT of the brain. This report states:
 * * * comparison is being made to the brain CT from 9/4/99. The small left frontal contusion has completely resolved. There is still a small fluid over the left frontal lobe thought to represent a very small subdural hygroma. No subarachnoid hemorrhage is evident . . . resolution of the left frontal lobe contusion since 9/4/99. Small stable left frontal subdural hygroma.
Appellant's Exhibit P contains two x-ray reports for Mr. Westfall. The first is an x-ray of Mr. Westfall's chest and indicates no evidence of "pneumothorax.[11]" The second report, also dated September 5, 1999, indicates the results of three views of Mr. Westfall's right ankle. The report states:
 * * * two or three small boney fragments are identified just below the medial malleolus. These could represent old avulsion fractures or un-united accessory ossicles. I doubt the presence of acute fracture.
At the hearing on appellant's post-conviction relief petition, held May 21, 2001, the State presented the testimony of Mr. Shamansky. Mr. Shamansky testified he discussed all aspects of the case with appellant.[12] He further indicated he specifically explained the defense of self-defense.[13] Mr. Shamansky testified not only did he discuss strategies, defenses, and potential penalties given any plea with appellant, Mr. Shamansky also conducted a full and complete review of all of the State's evidence. Mr. Shamansky testified he did not advise appellant the trial court would sentence him to probation or community control should he plead guilty.
Mr. Shamansky also testified as to the strategy on entering a plea. Specifically, he encouraged appellant to apologize and to be contrite. He encouraged appellant to make restitution and to take actions which might convince the victims incarceration would not be appropriate. On cross-examination, Mr. Shamansky stated he was disturbed and upset by the sentence imposed by the trial court. Appellant's counsel during the post-conviction hearing questioned Mr. Shamansky with regard to information he received about the victims. When asked whether he had done anything to dispel the trial court's belief the two victims were "innocent," Mr. Shamansky answered:
 To answer your question probably no. Because I recall my focus was on acceptance of responsibility of Brad. And there are times I think it is effective to try to, * * * [put] the victims on trial, I'm not the least bit bashful about doing that. I felt in this case, given the acceptance of responsibility that was forthcoming at the plea hearing, that it made sense to try to extenuate the positive. This man had a lot of positive going on. I chose, I think, rather to try to highlight his background, his responsibility, his family, rather than a man pursuing him at night.[14]
Appellant did not question Mr. Shamansky about the medical records of either victim.
In a June 13, 2001 Judgment Entry, the trial court denied appellant's petition for post-conviction relief. It is from this judgment entry appellant prosecutes his appeal, assigning the following as error:
 THE TRIAL COURT ERRED IN FINDING THAT APPELLANT WAS NOT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL DURING THE SENTENCING PHASE OF HIS CRIMINAL MATTER.
 THE TRIAL COURT ERRED IN FINDING THE APPELLANT WAS NOT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE TRIAL/PLEA STAGE BECAUSE COUNSEL WAS INADEQUATELY PREPARED FOR A TRIAL OF THE MATTER AND COUNSEL WAS INADEQUATELY PREPARED TO ADVISE THE APPELLANT REGARDING PLEA OFFERS EXTENDED BY THE STATE OF OHIO.
 I.
In appellant's first assignment of error he maintains the trial court erred in finding he was not deprived of effective assistance of counsel during the sentencing phase of his criminal matter. Appellant claims his victims, Mr. Westfall and Mr. Ramsey, lied about the extent of the injuries appellant inflicted during the incident, as demonstrated by the medical records. Appellant maintains his trial counsel failed to investigate the inconsistencies and failed to present any evidence of the inconsistencies to the trial court as evidence of mitigation. Appellant also maintains his trial counsel failed to present such information at a hearing on the reconsideration of the sentence. We disagree with appellant's contentions.
The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington[15], in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different.[16]
In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential.[17] Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance.[18]
In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.[19] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[20]
Appellant failed to provide the trial court hearing the petition for post-conviction relief with complete, certified medical records of either victim. Exhibit N contains only one page of a three page document. Appellant did not provide complete medical records demonstrating the full extent of the victims' injury, and yet asks this Court to determine actual injuries with only brief glimpses into individual x-rays taken during the course of the victims' hospital stays.
We also note appellant failed to question Mr. Shamansky with regard to his knowledge of these medical records at the post-conviction relief hearing. Therefore, the record is devoid of evidence to indicate whether or not Mr. Shamansky had the full medical records and whether any decision to use such records was tactical. The record does not indicate whether the full medical records were contained in the prosecutor's file or if Mr. Shamansky had obtained the records from other sources.
Notwithstanding appellant's contentions, the evidence presented at the various hearings indicates both victims suffered serious injuries requiring hospitalization for a period of days. It is possible, as appellant contends, Mr. Shamansky either had the medical records and failed to use them, or that he simply failed to obtain records which could have shown the victims exaggerated their injuries.
However, we find it equally reasonable to conclude Mr. Shamansky had access to the full records and chose not to use them. It is entirely possible the full medical records contained evidence of serious injuries not contained in the few pages attached to appellant's petition. If this were true, Mr. Shamansky would have had no reason to attack the victim's statements of their injuries. In light of the fact we do not have complete medical records for either victim, this Court cannot determine, the "actual injuries" sustained by either victim or compare such "actual injuries" the victims' statements to the trial court. Appellant's assertion counsel "obviously never investigated the actual injuries sustained" by the victims is not affirmatively demonstrated by the record.
We do know, from the medical records attached appellant's petition, Mr. Ramsey spent at least three days in the hospital. We further know Mr. Westfall spent at least two days in the hospital. This evidence, in and of itself, suggests serious injury to both victims. The record also contains photographs of the victims after the incident.
We find appellant cannot demonstrate his trial counsel's performance was deficient during the sentencing phase. Even assuming arguendo, his trial counsel was deficient, there is no record demonstration any such error on the part of his trial counsel was so serious to created a reasonable probability the result of the sentencing would have been different.
Appellant's first assignment of error is overruled.
 II
In appellant's second assignment of error, he maintains the trial court erred in finding he was not deprived of the effective assistance counsel at the trial-plea stage due to his trial counsel's inadequate preparation for trial and his trial counsel's failure to advise appellant on plea offers extended by the State.
Appellant acknowledges the decision to proceed to trial or to enter a plea is a tactic, and such a choice is not generally attributable to ineffective assistance to counsel. However, appellant maintains Mr. Shamansky's lack of appropriate investigation in order to advise his client as to what would be in his best interest caused the ineffective assistance of counsel. Appellant bases this conclusion on the testimony provided by Mr. Shamansky at the post conviction relief hearing.
Appellant first points out Mr. Shamansky did not remember if he read Mr. Ramsey's police statement. The actual testimony by Mr. Shamansky was as follows:
 Q. I show you defendant's exhibit B. This is a statement from Dean Ramsey, * * * Brooke Ramsey's father, and I just wondered if you ever, if you can remember, reviewing that statement that Dean Ramsey gave the night of the incident back in September 1999?
 A. If it was * * * as I look today to review this statement, if that was contained in the discovery, I would have reviewed it, my investigator would have reviewed it, and I would have of course sent a copy to Mr. Tapp.[21]
Appellant also attacks Mr. Shamansky's failure to recall the names of witnesses Mr. Gary Davis and Ms. Peggy Williamson. Appellant maintains Mr. Davis would have testified he saw Mr. Westfall pursuing appellant and yelling at him. In fact, the testimony was as follows:
 Q. And do you recall in particular there's a witness named Gary Davis, who would have been willing to testify, that Brad did not have a weapon in his hand that night; to recall ever reviewing statements he made or talking to this individual?
 A. Independent, without going back, but I believe that if Gary Davis, if that's what was said by Gary Davis, he testified to that, that would be correct. No weapons were involved, of any sort.[22]
Appellant also took issue with Mr. Shamansky's inability to recall Peggy Williamson as a witness. Appellant maintains Ms. Williamson could have testified she observed injuries to the appellant several days after the September 4, 1999 incident. Apparently, these injuries were consistent with appellant's assertion Mr. Westfall was the aggressor. At the hearing the following testimony was offered:
 Q. When you discussed with Mr. Tapp his right to have witnesses testify on his behalf, did you ever discuss with him witnesses Peg Williamson, Daphne Tapp or Gary Davis?
 A. I cannot remember the precise witnesses discussed. I, of course, remember Daphne Tapp, the other two names don't ring a bell.
We have reviewed the record. Mr. Shamansky did not testify he never interviewed these witnesses. Rather, after a lapse of time, he could not remember the specific names of the witnesses. Mr. Shamansky testified it was his strategy to present Appellant as responsible individual who had committed a grave mistake due to an addiction to alcohol. He attempted to show appellant as penitent, and willing to accept responsibility for the incident. Any witnesses or testimony relevant to whether Mr. Westfall pursued appellant before appellant assaulted the victim, would be inapposite to the strategy of accepting responsibility.
Appellant also maintains Mr. Shamansky failed to advise him of all applicable defenses to the charges before advising the plea. This contention is directly refuted by Mr. Shamansky's testimony, as noted in the Statement of the Case and Facts, supra.[23]
Appellant has pointed to no record evidence to indicate his trial counsel's representation was deficient. Assuming arguendo, appellant's trial counsel's was deficient, appellant has shown no error so serious as to demonstrate a reasonable probability the result of the sentencing would have been different if such an error had been made. It appears to this Court Mr. Shamansky's decisions were a matter of strategy, and as such cannot be regarded as ineffective assistance of counsel.[24]
Appellant's second assignment of error is overruled.
The June 13, 2001 Judgment Entry of the Delaware County Court of Common Pleas is affirmed.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Delaware County Court of Common Pleas is affirmed.
Costs assessed to appellant.
Hon. Julie A. Edwards, P.J., Hon. William B. Hoffman, J., Hon. W. Scott Gwin, J., concur.
[1] Tr. at 4.
[2] Tr. at 5.
[3] Presentence investigation at 9.
[4] Presentence Investigation at 9.
[5] Presentence Investigation at 10.
[6] Id.
[7] Id.
[8] Sentencing Hearing at 19-21.
[9] Tr. Motion for Reconsideration at 9.
[10] Presentencing Hearing at 12.
[11] Webster's dictionary defines "pneumothorax" as an "[a]ccumulation of air or gas in the pleural cavity, occurring as a result of injury or disease and sometimes induced to collapse the lung in the treatment of tuberculosis and other lung diseases." New College Edition, 1995, at p. 850.
[12] Tr. at 177.
[13] Id.
[14] Tr. at 191-192.
[15] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673.
[16] State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; Statev. Combs, supra.
[17] Bradley, 42 Ohio St.3d at 142.
[18] Id.
[19] Bradley, supra at syllabus paragraph three.
[20] Id.
[21] Tr. at 190.
[22] Tr. at 189.
[23] Tr. at 177-178.
[24] See, State v. Coleman (1989), 45 Ohio St.3d 298, 308.